IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
                                  )
D.R., by and through his parent,)
Etsuko R.,                        )
                                  )
              Plaintiff,          )
                                  )
        vs.                       )    Civ. No. 11-00116 ACK-KSC
                                  )
DEPARTMENT OF EDUCATION, STATE    )
OF HAWAIʻI,                       )
                                  )
              Defendant.          )
                                  )
```

## ORDER AFFIRMING THE FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION OF THE OFFICE OF ADMINISTRATIVE HEARINGS

### I. FACTUAL AND PROCEDURAL BACKGROUND

D.R. ("Student") is a student who is eligible for special education under the Individuals with Disabilities Education Act ("IDEA"), and has been receiving services under that Act for several years.  Acting on his behalf, his mother ("Plaintiff") filed a Request for Impartial Due Process Hearing challenging the sufficiency of an individualized education program ("IEP") that was developed in June 2010.[1]  (Admin. R. Ex. 2.)  At the time the June IEP was developed, Student had been

_____

[1] The June IEP supplanted an IEP that had been developed in November 2009.  (Admin. Decision at 5.)  The November IEP was developed as part of the annual IEP process, whereas the June IEP was developed after Student's mother expressed concerns and requested additional assessments during the school year.  (Id. at 7-9.)

attending a private school, the Variety School, for more than three years. (Opening Br. Ex. A ("Admin. Decision") at 5.)[2] At the hearing before this Court, Defendant indicated that Student's mother had unilaterally placed Student at the Variety School beginning in 2007, but that as a result of a settlement agreement, Defendant was paying for Student's education at the Variety School.[3] After the June IEP was developed, Student's mother unilaterally placed Student in another private school, Loveland Academy. (Id.)[4] She had informed Defendant that she intended to enroll Student at Loveland in March. (Id. at 7.)

After a hearing, an administrative hearings officer issued a Findings of Fact, Conclusions of Law, and Decision in favor of the Department of Education ("Defendant") and against Plaintiff. (Admin. Decision at 29.) Plaintiff filed this action for review of that decision pursuant to 20 U.S.C. § 1415(i)(2)(A), which gives parties who are "aggrieved by the

---

[2] The Variety School declined to attend the IEP meetings. (2 Tr. at 187.) However, Defendant actively sought input from the Variety School, not only by obtaining "previous assessments [and] progress reports" from the Variety School, but also by, inter alia, observing Student at the Variety School and seeking input from personnel at that school concerning Student's behavioral needs. (Admin. Decision at 8–15, 19–23.)

[3] This settlement agreement is referred to in the hearing request.

[4] Plaintiff sought in the administrative proceeding a determination that the "stay put" provision, 20 U.S.C. § 1415(j), was in effect. The parties have not addressed this issue in this Court.

findings and decision" in a due process hearing the right to file a civil action challenging the findings and decision, and 20 U.S.C. § 1415(i)(3)(A), which confers on federal district courts nonexclusive original jurisdiction over such challenges.

The Court will AFFIRM the Findings of Fact, Conclusions of Law, and Decision.

## II. STANDARD

In evaluating an appeal of an administrative decision under the IDEA, a court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[5]  20 U.S.C. § 1415(i)(2)(C).[6]

The statutory requirement "that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. v. Rowley, 458 U.S. 176, 206

_____

[5] No party has requested that the Court hear additional evidence in this action.

[6] An amendment to the IDEA, effective July 1, 2005, affected the subsection number at which this provision appears in the statute but did not affect the text of the provision. Compare 20 U.S.C. § 1415(i)(2)(B) (in effect prior to July 1, 2005) with 20 U.S.C. § 1415(i)(2)(C) (effective July 1, 2005).

(1982).  Rather, "due weight" must be given to the findings in the administrative proceedings.  Id.

The amount of deference given to administrative findings in this context is a matter of judicial discretion.  See Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).  A court must "consider the findings 'carefully and endeavor to respond to the hearing officer's resolution of each material issue,' but 'is free to accept or reject the findings in part or in whole.'"  Id. (quoting Gregory K., 811 F.2d at 1311).  "When exercising its discretion to determine what weight to give the hearing officer's findings," a court may "examine the thoroughness of those findings" and accord greater deference when they are "'thorough and careful.'"  Id. (quoting Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994)).

A court's inquiry in reviewing administrative decisions under the IDEA is twofold:  "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the

courts can require no more." <u>Rowley</u>, 458 U.S. at 206-07
(footnotes omitted); <u>see also</u> <u>Smith</u>, 15 F.3d at 1524.

The IDEA defines a "free appropriate public education"
as one that, <u>inter alia</u>, is "provided in conformity with the
individualized education program required under section 1414(d)
of this title."  20 U.S.C. § 1401(9)(D).  "[W]hen a school
district does not perform exactly as called for by the IEP, the
district does not violate the IDEA unless it is shown to have
materially failed to implement the child's IEP.  A material
failure occurs when there is more than a minor discrepancy
between the services provided to a disabled child and those
required by the IEP."  <u>Van Duyn ex rel. Van Duyn v. Baker Sch.</u>
<u>Dist. 5J</u>, 502 F.3d 811, 815 (9th Cir. 2007).[7/]

## III. DISCUSSION

Plaintiff raises several arguments that the IEP was
deficient, both procedurally and substantively.  Indeed, certain
of Plaintiff's arguments are repeated throughout the briefs.  The
discussion below consolidates Plaintiff's related or repeated

_____

[7/] The <u>Van Duyn</u> court noted that "most IDEA cases involve
the formulation rather than the implementation of an IEP."  502
F.3d at 820.  This IDEA case is like most in that way.  Despite
the statement in the opening section of the brief that "Plaintiff
didn't ask the Hearings Officer to look at the IEP for
appropriateness, but to look at the appropriateness and
implementation of the services rendered at Variety School," all
of the "issues on appeal" raised in the briefing concern the
development of the IEP, save for the issue of whether the
administrative hearings officer should have recused himself.
(Opening Br. at 4, 5-6.)

arguments, and so is organized somewhat differently than the
briefs.

## A.        Bias

Plaintiff's lead argument in this case is that the
administrative hearings officer should have recused himself from
hearing the case.  Plaintiff notes that the officer was formerly
employed as a Deputy Attorney General for the State of Hawaiʻi
and represented the Department of Education in other matters, and
further that the officer was a former co-worker of the lawyer who
represented the Department at the hearing.  (Opening Br. at 9.)
Beyond that, Plaintiff asserts that the officer, in his former
capacity as an attorney, was "<u>more</u> than a zealot" in his
advocacy.  (<u>Id.</u> at 10) (emphasis in original).  Plaintiff claims
that the officer "was terminated presumably for cause" from his
position as an administrative hearings officer at some point
after the hearing.  (<u>Id.</u>)  Plaintiff also notes that "in the last
six cases that [the officer] presided over, he ruled exclusively
in the DOE's favor."  (<u>Id.</u>)  Plaintiff concludes that the officer
was "clearly biased and unfair in his current decision."  (<u>Id.</u>)

Defendant describes "the accusations and claims being
made against the Hearings Officer" as "particularly troubling."
(Opp'n at 10.)  Defendant notes that Plaintiff's attorney, who
did not appear in this case at all until months after the
administrative hearing had concluded, "was not involved in the

underlying administrative proceeding and lacks any first-hand knowledge to support the accusations being made about the Hearing Officer's conduct at the hearing." (Id.) Defendant adds that there was no motion made in the administrative proceeding for the officer to recuse himself. (Id. at 11.) At the hearing before the Court, Defendant's counsel informed the Court that the reason for the administrative hearings officer's termination was that the funding for his position had been eliminated, and that the officer had from time to time served in a temporary role as an administrative hearings officer after his position was terminated.

In reply, Plaintiff summarizes the accusations previously leveled, and then argues that "the mere appearance of partiality suffices for non-waivable disqualification," and that in any case, this appeal is the first opportunity to move for disqualification because "the full grounds for disqualification [were] not ascertained until after the decision was rendered by the Hearings Officer." (Reply at 2-3.)

The Court assumes arquendo that Plaintiff's argument concerning the officer's alleged bias may be raised in this action. The Court nonetheless rejects the proposition that the officer should have recused himself. The Court has reviewed the officer's decision and finds no evidence that the officer exhibited any bias in deciding this case. Both parties'

submissions and testimony were weighed, and the officer's
decision was well-reasoned and balanced.  Because the Court finds
that there is no evidence of bias in the administrative hearings
officer's decision, the Court need not consider the various
personal attacks leveled against the officer.

Moreover, the officer's former employment as a Deputy
Attorney General does not give the appearance of bias such that
recusal would have been appropriate even in the absence of bias.
The IDEA specifies that a hearing officer shall not be "an
employee of the State educational agency or the local educational
agency involved in the education or care of the child."  20
U.S.C. § 1415(f)(3)(A)(i).  The IDEA expressly bars <u>current</u>
employees of educational agencies from serving as hearing
officers, but says nothing about <u>former</u> employees of those
agencies—much less former employees of those agencies' attorneys.
<u>Id.</u>  This indicates that there is no per se rule that precludes
attorneys for the Department of Education from later becoming
administrative hearings officers.  And Plaintiff has pointed to
no authority for such a rule.

The IDEA further specifies that the officer shall not
be "a person having a personal or professional interest that
conflicts with the person's objectivity in the hearing."  <u>Id.</u>
The Court finds that the officer had no such "personal or

professional interest," and, in any event, the Court finds that the officer was objective.

**B.**        **Degree of Deference**

The administrative hearings officer's analyses of Student's occupational therapy needs and whether he had been placed in the least restrictive environment was brief.  Indeed, the two analyses total only three sentences.  (Admin. Decision at 27.)  Yet two of those sentences note the "absence of sufficient evidence" presented at the hearing.  (Id.)  It appears to the Court that the officer deemed those issues as having been abandoned.

Plaintiff points to these two sections in arguing that the officer's decision was "arbitrary and capricious," as well as "conclusory," and therefore "should not be given any deference." (Opening Br. at 19-20.)  Yet Plaintiff has made no affirmative argument concerning these issues in this Court, and did not make one in the post-hearing brief below.  (Admin. R. Ex. 15.)  In this case, it is Plaintiff's burden to demonstrate that the IEP is insufficient.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."); see also Van Duyn, 502 F.3d at 820 ("Van Duyn, as the party objecting to the IEP's implementation . . . bore the burden of proof at the administrative hearing.").

Even if the Court were to reject the administrative hearings officer's conclusions, the Court would reach the same result. Plaintiff has failed to demonstrate that the IEP was deficient in terms of providing Student with occupational therapy and educating him in the least restrictive environment.

Concerning Student's needs for occupational therapy, the June IEP noted that Student's therapy at Variety School had "focused on keyboarding, strengthening[,] and bilateral coordination skills." (Admin. R. Resp't's Ex. 4 ("June IEP") at 4.) The IEP noted certain strengths in this area: Student "[d]emonstrated functional handwriting," "[c]opied text in an efficient manner by copying whole words or chunks of words," and "[d]isplayed adequate fine motor coordination to manipulate a variety [of] classroom tools and materials and [to] perform tasks requiring a moderate degree of precision." (Id.) As needs, the IEP noted "[d]ecreased postural tone and visual perceptual skills, that may impact endurance and performance of classroom skills." (Id.) To address these needs, the IEP provided for occupational therapy services of 270 minutes per quarter, or thirty minutes per week. (Id. at 28.) The services were to be "done individually only." (Id.) Plaintiff has not attempted to demonstrate that the occupational services provided by the plan were not sufficient under the IDEA.

Likewise, in terms of educating Student in the least restrictive environment, the IEP provided that Student "will participate with nondisabled peers during recess, lunch, homeroom, PE[,] and electives," and further provided that Student "will participate with disabled peers in the special education subject for reading, English, math, science, and social studies." (Id. at 29.)  Given the same degree of participation provided for in the November IEP, Student's mother had stated that Student "benefits from a small, nurturing class and small nurturing campus with related service staff available throughout the school day with mental health oversight."  Plaintiff has made no showing that the IEP would not have educated Student in the least restrictive environment.[8]  And as Defendant noted at the hearing, Plaintiff's current school, Loveland Academy, appears to be a more restrictive environment than either the Variety School or Student's home school.  Plaintiff's brief describes Loveland as a "mental health treatment facility," and Plaintiff has not described any mainstreaming opportunities that are available for Student at Loveland.

As for the remainder of the decision, the Court disagrees with the characterization that "nearly all of the

---

[8]  Contrary to Plaintiff's attorney's statement at the hearing, the initial request for a due process hearing did complain that Student had not been placed in the least restrictive environment.  This complaint appears to have been abandoned during the course of the proceedings.

Hearings Officer's conclusions of law are conclusory in nature."
The Court finds that, in general, the officer weighed both
parties' arguments in reaching his decision, and supported his
conclusions by reference to the evidence presented at the
hearing. In other words, the Court finds that the decision was
"thorough and careful" and therefore accords it significant
deference. Capistrano, 59 F.3d at 891.

**C.**      **Consideration of Reports from the Previous Private**
            **School**

        Plaintiff repeatedly complains that the administrative
hearings officer relied on progress reports from Student's
teachers at the Variety School. Plaintiff characterizes these
reports as "anecdotal hearsay information" and states that the
officer gave them "irrefutable weight." (Opening Br. at 13.)
Defendant notes that Plaintiff's attorney at the time of the
hearing stipulated to the admissibility of those reports, such
that any challenge to them was waived. (Opp'n at 11-12.)

        The Ninth Circuit has held that a claim not raised "in
[an] administrative complaint or due process hearing" was not
exhausted and therefore not authorized by § 1415(i)(2)(A). J.L.
v. Mercer Island Sch. Dist., 592 F.3d 938, 952 (9th Cir. 2010).[9/]

_____

        [9/] The J.L. court held that the district court "lacked
subject matter jurisdiction to consider [the] unexhausted claim."
592 F.3d at 952. The Ninth Circuit has since held that the
IDEA's exhaustion requirements, referred to in 20 U.S.C.
§ 1415(*l*), are not jurisdictional. See Payne v. Peninsula Sch.
(continued...)

Defendant argues that many of Plaintiff's claims were not raised during the administrative process and therefore cannot be raised for the first time in this Court. The Court agrees with Defendant that Plaintiff may not challenge the officer's consideration of the Variety School progress reports in this action. In any event, however, the Court disagrees with Plaintiff that the reports were given "irrefutable weight." Rather, the reports were just one of many types of evidence that the officer considered.

**D.** **Auditory Processing Disorder Screening**

One of the claims raised by Plaintiff is that the screening of Student for Central Auditory Processing Disorder should have been replaced by a full assessment. Plaintiff relies on 20 U.S.C. § 1414(a)(1)(E), which provides that "[t]he screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum

---

[9/] (...continued)
Dist., No. 07-35115, 2011 WL 3211503, at *6 (9th Cir. July 29, 2011) (en banc). But the Payne court nonetheless noted its "understanding that the exhaustion provision is designed to 'allow[] for the exercise of discretion and educational expertise by state and local agencies, afford[] full exploration of technical educational issues, further[] development of a complete factual record, and promote[] judicial efficiency by giving . . . agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'" Id. at *11 (alterations and omission in original) (quoting Hoeft v. Tucson Unified Sch. Dist., 967 F.3d 1298, 1303 (9th Cir. 1992)).

implementation shall not be considered to be an evaluation for eligibility for special education and related services."[10]

The administrative hearings officer noted that Student was administered a screening test for Central Auditory Processing Disorder and passed it. (Admin. Dec. 15.) According to the DOE's audiologist, the protocol for the evaluation "called for no further testing if the student passed the screening tests," because "[i]f you pass all three tests, then you have normal auditory processing abilities." (Id. at 15–16.)[11] Indeed, the audiologist noted that "auditory processing was a relative strength of Student," because his auditory processing tested as "normal" whereas he tested "below normal" in other areas. (Id. at 16.)[12]

---

[10] Plaintiff actually cites 34 C.F.R. § 300.302, a regulation with text identical to the text in the statute.

[11] As Defendant points out, Plaintiff's expert does not appear to have opined that the protocol violates any standard of care in testing for Central Auditory Processing Disorder. (Opp'n at 15; 2 Tr. at 157–60.) At the hearing before this Court, Defendant also noted that Plaintiff's expert witness is a speech pathologist, but is not an audiologist. However, the witness was offered as an expert in audiology at the administrative hearing and Defendant did not object. (2 Tr. at 133.)

[12] Plaintiff also argues that the IEP process was deficient because the audiologist did not attend the IEP team meeting. The administrative hearings officer concluded that he could not address this issue because it had not been raised in the request for a hearing. (Admin. Decision at 18.) Plaintiff has not contested this conclusion, which the Court adopts. See J.L., 592 F.3d at 952. The IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the (continued...)

It does not appear to the Court that the cited statute precludes the decision to, first, conduct the initial screening for Central Auditory Processing Disorder, and second, when that screening did not indicate any disorder, omit conducting the full evaluation. See A.P. ex rel. Powers v. Woodstock Bd. of Educ., 572 F. Supp. 2d 221, 228 n.2 (D. Conn. 2008) (noting the United States Department of Education's comment that "[t]here is nothing in the Act that requires a State to, or prohibits a State from, developing and implementing policies that permit screening children to determine if evaluations are necessary") (alteration in original). Even assuming that the screening was conducted by a "teacher or specialist" as those terms are used in the statute, the screening was not intended "to determine appropriate instructional strategies for curriculum implementation." It was intended to determine whether Student might have Central Auditory Processing Disorder. Moreover, the screening was not used as "an evaluation for eligibility for special education and related

---

[12/] (...continued)
due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B).

In any event, given that the audiologist answered questions in writing, (2 Tr. at 224-25), Plaintiff would have considerable difficulty showing that the failure to have the audiologist in attendance was so severe a procedural violation as to constitute a denial of a free appropriate public education. See Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 892 (9th Cir. 2001) ("Not every procedural violation . . . is sufficient to support a finding that the child in question was denied a FAPE.").

services," as there is no question in this case that Student is eligible for those services.[13]

**E.**     **Speech Disability Evaluation**

Plaintiff also argues that Defendant filed to properly evaluate Student's speech deficit because Defendant failed to identify that Student might have a submucous cleft palate. (Opening Br. at 24-26.)

There is no dispute that Student's parents were aware of a January 2009 clinical determination that Student might have a submucous cleft palate but did not share that information with the IEP team. The administrative hearings officer acknowledged that Plaintiff had "no obligation under the IDEA to provide the IEP team 'sufficient' information." (Admin. Decision at 26.) Nonetheless, the officer stated, "not to share information, intentionally or not, and then take Respondent to task on

---

[13] The Court is aware of no case that has interpreted the statute, and only one other that has interpreted the regulation. In M.W. ex rel. Wang v. Clark Cnty. Sch. Dist., No. 3:06-CV-49(CD), 2008 WL 4449591 (M.D. Ga. Sept. 29, 2008), the court considered in a footnote whether an "Assessment of Basic Language and Learning Skills" test ("ABLLS") was required to be "provided and administered in the child's native language," Mandarin Chinese, because the federal regulations in effect at the time of the ALJ's final decision in that case required native-language assessments "when a child is evaluated for eligibility for services." Id. at *14-15 & n.21. The Court concluded that since the ABLLS was "not used to determine a child's eligibility for services," but instead was "an assessment and a curriculum guide," the native-language requirement may not have applied. Id. at n.21. In making this determination, the Court noted § 300.302's prohibition on using screenings as an "evaluation for eligibility." Id.

information they failed to discover or failed to specifically ask for, especially when Petitioners had the information the whole time at issue, is inequitable at best." (Id.)

The administrative hearings officer was correct that where parents have information relevant to the development of an IEP in their possession, and fail to share it with the IEP team, they cannot later complain that the IEP is deficient for not addressing the withheld information. "[B]efore they can fairly argue that the best the school authorities had to offer was or is not good enough, the critical pre-requisite is that the parents must have cooperated with the school authorities . . . to try to develop the IEP." S.M. v. Weast, 240 F. Supp. 2d 426, 436 (D. Md. 2003). Plaintiff, for whatever reason, failed to disclose important information. See id. at 437 ("The parents . . . held back critical data they had in hand, some of which might well have been incorporated in the IEP."); see also Robert M. v. Hawaii, Civ. No. 07-00432 HG-LEK, 2008 WL 5272779, at *15 (D. Haw. Dec. 19, 2008) ("Parents of a student qualified for services under the IDEA may not withhold critical information from the IEP team, and then claim a [free appropriate public education] was not provided.").[14]

---

[14] Plaintiff, citing Plaintiff's expert's testimony that "if a child has a physiological or anatomical problem . . . you are bound under our Code of Ethics to refer that child medically," argues that Defendant's personnel "violated the standards of
(continued...)

The administrative hearings officer wondered, "how would Respondent suspect a disability when the basis of that suspicion is not shared with the IEP team?" (Admin. Decision at 24.) Plaintiff claims that "[t]he issue of the cleft palate of the Plaintiff should have been obvious to the experts employed by the Department of Education based on the obvious hyper nasal speech patterns of [Student]." (Reply at 7.) It does not appear from the briefing that Plaintiff argued to the administrative hearings officer that the issue should have been "obvious," and Plaintiff did not seek to introduce evidence to this Court that it was.[15] See 20 U.S.C. § 1415(i)(2)(C)(ii). In any event, the

_____

[14] (...continued)
practice for speech pathologists." (Opening Br. at 26–27.) It does not appear to the Court that the expert's testimony says anything about ethical obligations to "refer [a] child medically" due to "physiological or anatomical problem" that was unknown to the Department. There is no indication that, had Defendant been made aware of the diagnosis of a possible submucous cleft palate, Defendant would have failed to refer Student to medical professionals.

[15] Plaintiff's expert testified that "[w]hen you listen to [Student], you not only hear the hyper nasality on the vowel sounds, but you actually hear him emitting air out of his nose. It's very audible and very noticeable. You can also see his nostrils flaring slightly, when the air is coming out of his nose." (2 Tr. at 149.) The Court does not find that this testimony demonstrates that the potential that student had a submucous cleft palate should have been obvious to Defendant.
The expert testified that a submucous cleft palate would affect the ability to make T, D, CH, and J sounds. (Id. at 148.) But she also testified that another of Student's conditions would affect the ability to make the same sounds. (Id. at 146.) That second condition was surgically repaired at some point during 2010, but it is not clear whether the surgery had been performed
(continued...)

-18-

Court disagrees with the notion that Student's parents are free to withhold information about a problem and then in retrospect contend that the problem is obvious.

The administrative hearings officer was also correct that the sufficiency of the IEP cannot be judged in light of information that no party had when the IEP was developed. See Adams v. Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999) ("We do not judge an IFSP in hindsight; rather, we look to the IFSP's goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer Lucas with a meaningful benefit."); cf. Marc. M. ex rel. Aidan M. v. Dep't of Educ., State of Hawaiʻi, 762 F. Supp. 2d

---

[15]/ (...continued)
at the time the IEP was developed. (Id.)
     The expert also testified that she suspected the condition based on a test where she "looked at his palate with a flashlight, and actually put gloves on, and felt along his palate." Even as discovered by that test, the symptoms as described by the expert appear to be quite subtle, rather than obvious: "a notch at the back of his hard palate," and "a thin, silver line . . . along the midline of his palate." (Id. at 147.) She also testified that she examined Student's pharynx to determine whether there was lateral movement, and that "[i]t's hard to tell without doing endoscopy just with the naked eye. But it didn't look like [the lateral walls of the throat] were moving very well." (Id.) Finally, she testified that the cause of Student's "velopharyngeal insufficiency," that is, Student's body's inability to prevent air from escaping through his nose when he spoke, "could be peripheral nerve dysfunction . . . or it could be structural . . . or it could be both."
     In sum, Plaintiff's expert's testimony was that Student's speech difficulties could have been caused by a number of factors. The Court therefore cannot conclude from the expert's testimony that the possibility that Student had a submucous cleft palate was "obvious."

1235, 1243–44 (D. Haw. 2011) (distinguishing Adams when

documentation was provided to the IEP team).[16/]  In this case, the

"Private School Expert's report dated October 22, 2010, relating

to the submucous cleft palate," had not yet been prepared when

the June IEP was developed.[17/]  (Admin. Decision at 24).  The June

_____

[16/] An "IFSP" is an "Individual Family Service Plan," a type
of plan provided by the IDEA for infants and toddlers.  See Marc
M., 762 F. Supp. 2d at 1243 & n.1.  Adams has not been limited to
IFSPs, however.  See id.  Indeed, Adams cited an IEP case for the
proposition that "[a]ctions of the school systems cannot . . . be
judged exclusively in hindsight."  Adams, 195 F.3d 1149 (omission
in original) (quoting Fuhrmann v. E. Hanover Bd. of Educ., 993
F.2d 1031, 1041 (3d Cir. 1993)).

[17/] In a footnote, Plaintiff distinguishes between "the time
the IEP was drafted [and] when the IEP was implemented.  (Opening
Br. at 18 n.3 (citing Marc M., 762 F. Supp. 2d at 1242–45).)  In
Marc M., the Department received information from parents "at the
conclusion of the IEP meeting" and argued that it had no
responsibility to consider it because the IEP had been developed
prior to the meeting.  See 762 F. Supp. 2d at 1243.  The court
stated that "once a state is on notice of a potential flaw in the
IEP's development, it is responsible for correcting it," and
found that in that case, "the Defendant was aware that a more
recent evaluation than those used to prepare the PLEP and IEP
existed but did not attempt to revise the IEP accordingly."  Id.
at 1245.  This case is distinct from Marc M.  The record does not
reflect that the IEP team was made aware of the withheld
information either during the development of the IEP or in
advance of the time it would have been implemented absent the
unilateral decision to place Student at Loveland Academy.
Indeed, as far as the Court can discern, the withheld information
was not disclosed until after the administrative proceedings had
already commenced; the hearing request makes no mention of the
January 2009 diagnosis of a potential submucous cleft palate, and
predates the second diagnosis that was made "[b]etween September
16, 2010 and October 22, 2010."  (Admin R. Ex. 1; Admin. Decision
at 7.)  Indeed, the administrative hearings officer noted that
the request "does not specifically claim this particular failure
to identify the submucous cleft of the palate, and related
issues"; the officer considered the issue raised at all only
(continued...)

IEP is not deficient for failing to incorporate the October report.

This is not a case where Defendant failed to recognize that Student might require special education services, in general or in the area of speech therapy. See 20 U.S.C. § 1412(a)(3) (conditioning federal funding for state special education programs on a requirement that states have policies and procedures to identify, locate, and evaluate all children with disabilities residing in the state). In this case, Student had already been identified as eligible for special education services, and the IEP provided for speech therapy.

Moreover, not all procedural failures constitute a denial of a FAPE. See Amanda J., 267 F.3d at 892. Even assuming that the withheld information concerning Student's diagnosis would have led the IEP team to provide additional speech therapy, and even assuming that Defendant had an independent obligation to discover that diagnosis, Plaintiff has not shown that the speech therapy that was provided by the IEP was not "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. The lack of this showing distinguishes this case from cases cited by Plaintiff in which there were both procedural and substantive inadequacies, or in

_____

[17]/ (...continued)
under the broad claim that "[t]he IEP does not adequately identify all of Donicio's needs." (Admin. Decision at 24.)

which the procedural errors were so severe as to constitute a

denial of a free appropriate public education.[18]

## F.        Behavioral Needs[19]

---

[18] For example, in <u>J.G. v. Douglas Cnty. Sch. Dist.</u>, 552
F.3d 786 (9th Cir. 2008), the parents incurred the cost of the
private evaluation of twin students for autism in May, when the
school committed a procedural violation of the IDEA by failing to
notify the parents that it intended to conduct that evaluation.
<u>Id.</u> at 790.  Both parties agreed that the school's procedural
violation "deprived the twins of a FAPE." <u>Id.</u> at 794.  The court
reimbursed the parents for the full cost of the private
evaluation, even though the parents later refused to share the
results of the evaluation with the school in October, because "no
causal connection exists between the parents' refusal to share
the information they gained from the Center and the District's
prior delay in providing them notice." <u>Id.</u> at 794-95.  In this
case, of course, there is (or at least may be) a causal
connection between the parents' failure to share information with
the school and the resulting development of the IEP.  <u>See also</u>
<u>N.B. v. Hellgate Elementary Sch. Dist. ex rel. Bd. of Dirs.,</u>
<u>Missoula Cnty., Mont.</u>, 541 F.3d 1202, 1208-10 (9th Cir. 2008);
(school failed to evaluate student for autism even though school
was on notice that student "likely suffered from some form of
autism" in September, and IEP not revised to reflect needs based
on autism until parents obtained independent evaluation in
March); <u>Union Sch. Dist. v. Smith</u>, 15 F. 3d 1519, 1524-25 (9th
Cir. 1994) (school proposed placement for autistic child at
school where "there were no other autistic children," "there was
no evidence that the teacher had been trained to work with
autistic children," and the student, who "require[d] full-time,
one-to-one instruction and [was] unable to benefit from group
instruction" had not "developed the requisite skills to benefit
from placement in the [offered] program"); <u>W.G. v. Bd. of Trs. of</u>
<u>Target Range Sch. Dist. No. 23, Missoula, Mont.</u>, 960 F.2d 1479,
1484 (9th Cir. 1992) (school "proposed IEP that would place
[student] in a preexisting, predetermined program," without input
from student's parents, regular classroom teacher, or
representative from private school, and "assumed a 'take it or
leave it' position at the [IEP] meeting").

[19] Plaintiff complains that the administrative hearings
officer "did not make a specific discrete analysis or ruling on
Plaintiff's mental health needs."  (Opening Br. at 33.)  Yet as
(continued...)

Plaintiff also argues that "[t]he DOE did not conduct
an Emotional Behavioral Assessment, nor a neuropsychological
evaluation as requested by Plaintiffs," and therefore did not
offer Student a free appropriate public education. (Opening Br.
at 33-34.) As will be described further below, Defendant offered
to work with the Variety School and Student's mother in
developing a Behavioral Support Plan, and Defendant also reached
out to the Variety School to determine whether it was aware of
any behavioral concerns. The offer concerning development of a
plan was not accepted, and the Variety School did not express
concerns about Student's behavior. The Department refused to
conduct an emotional behavioral assessment because of the lack of
concerns expressed by the Variety School and because "Parent
concerns did not appear to be focused on behavior but rather on
[Student's] IQ scores and potential/ability." (Admin. Decision
at 8.) Defendant also refused to conduct a neuropsychological
evaluation, because Defendant's personnel "felt that because of
the previous neuropsychological conducted, in addition to the

_____

19/ (...continued)
will be described in this section, the officer analyzed what
Plaintiff describes as mental health problems, that is, a
"history of tantrums, shutting down . . . , hating school, and
wanting to kill himself" in the section concerning Plaintiff's
behavioral needs. (Id. at 33; Admin. Decision at 19-23.) The
Court does not find that the officer failed to address these
issues. Moreover, regardless of the officer's organization of
his decision, Plaintiff has not demonstrated that the Department
failed to offer a free appropriate public education with an IEP
that satisfies Student's behavioral and mental health needs.

three previous IQ scores that they already had, they could provide for the needs of [Student]." (Id. at 9.)

The administrative hearings officer's decision spends several pages describing testimony from various sources indicating that Student did not have behavioral or mental health problems that could not be addressed by the support provided for in the IEP.[20] (Id. at 8–12.) The administrative hearings officer particularly emphasized the testimony of one of Plaintiff's expert witnesses, who stated that "there seems to be like internal emotional distress. But it doesn't necessarily—it doesn't really present it [sic]." (Id. at 11, 20.) Plaintiff, both at the hearing and in briefing to this Court, described "a history of tantrums, shutting down . . . , hating school and wanting to kill himself." (Id. at 19).

The administrative hearings officer found that the tantrums, hating of school, and threats to commit suicide had subsided years before the IEP at issue was developed, and Plaintiff has not challenged that finding (which was based at least in part on Student's mother's testimony). (Id.) As for "shutting down," the administrative hearings officer relied on

---

[20] Student's IEP provided for Student to have full-time one-on-one adult support that was intended "to support [Student] by prompting, redirecting, clarifying, assisting and allowing [Student] breaks when needed." (Admin. Decision at 5 ("The 1:1 adult support will also chunk the work so [Student] doesn't get frustrated.").) The IEP specified that "the total time the 1:1 adult will be available is 8am – 3pm daily." (June IEP at 28.)

testimony from Student's former teachers that "a non-verbal prompt" and "rewarding student with some time on the computer" was sufficient to address the problem. Plaintiff has not challenged this finding either.

Further, even though no behavioral concerns were apparent, the administrative hearings officer found that "as a result of Mother's representations, Respondent offered Previous Private School and Mother assistance in creating a Behavioral Support Plan if it was needed by Student," and that "No request for a Behavior Support Plan was made by Mother or by Previous Private School." (Id. at 21.)[21/] Plaintiff has not challenged the findings that Defendant offered to "work with Variety to create a BSP" and that the offer was not accepted. (Admin. R. Resp't's Ex. 5 at DR 82; 2 Tr. at 208–10.)

In sum, the Court cannot find that Defendant's refusal to administer certain evaluations concerning Student's behavioral and mental health needs was a violation of the IDEA. The IEP provided for full-time 1:1 adult support, which appears more than sufficient to provide the "non-verbal prompt[ing]" that Student occasionally needed to avoid "shutting down." The concerns

---

[21/] The failure to request this assistance is relevant to the school's refusal to provide an emotional behavior assessment because, as the Home School Care Coordinator testified, "normally, if there are some behaviors of concern, then you would start with a behavior support plan, and see if that works, and then, if it doesn't work, then the team will use that data, and then go for . . . an emotional behavior assessment." (Id. at 8.)

raised by Loveland Academy after the IEP was developed do not render the IEP deficient.  <u>Adams</u>, 195 F.3d at 1149

**G.**        **Appropriateness of Loveland Academy**

The administrative hearings officer noted that "parents may be awarded reimbursement of costs associated with a unilateral placement" if they show two elements: first, that the IEP offered by the school district is <u>not</u> appropriate; and second, that the alternative placement <u>is</u> appropriate.  (Admin. Decision at 28 (citing <u>Sch. Comm. of Burlington, Mass. v. Dep't of Educ.</u>, 471 U.S. 359 (1985)).)

The administrative hearings officer did not reach the question of whether Loveland Academy is an appropriate placement for Student because he had determined that Plaintiff had "not proved that the June 10, 2010 IEP was inappropriate or that FAPE was not offered to Student."  (Admin. Decision at 28.)  The officer found both that Defendant "has complied with the procedural requirements of the IDEA and that the June 10, 2010 IEP was reasonably calculated to enable Student to receive educational benefits."  (<u>Id.</u> (citing <u>Rowley</u>, 458 U.S. at 206–07).)

The Court agrees with the officer's determination, and therefore will join the officer in choosing not to address the appropriateness of the placement at Loveland Academy.

**IV. CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the Findings of Fact, Conclusions of Law, and Decision of the Office of Administrative Hearings.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, October 21, 2011.



_____
Alan C. Kay
Sr. United States District Judge

D.R. v. Department of Education, State of Hawaiʻi, Civ. No. 11-00116 ACK-KSC: Order Affirming the Findings of Fact, Conclusions of Law, and Decision of the Office of Administrative Hearings